# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 21-1998V

|  |  |
|---|---|
| PEGGY TULLY,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>          Respondent. | Chief Special Master Corcoran<br><br>Filed: September 20, 2024 |

*David John Carney, Green & Schafle LLC, Philadelphia, PA, for Petitioner.*

*Nina Ren, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On October 12, 2021, Peggy Tully filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on September 28, 2020. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons described below, I find that Petitioner is entitled to compensation, and also award damages in the amount of **$62,500.00 for actual pain and suffering, plus reimbursement of portion of a Medicaid lien as further indicated herein.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.    Relevant Procedural History

This case was activated on March 9, 2022 (ECF No. 10). Petitioner filed additional medical records on May 26 and December 20, 2022 (ECF Nos. 14, 23). On May 31, 2023, Respondent stated he was amenable to informal resolution (ECF No. 28), and the parties negotiated. However, Petitioner soon reported that the parties were too far apart to resolve the case informally, and filed a motion for a ruling on the record addressing entitlement and damages (ECF Nos. 30, 32). Respondent opposed, and Petitioner replied (ECF Nos. 33, 34).

Petitioner's motion requested reimbursement of a Medicaid lien, and attached to the motion a letter from the State of New York listing the amount the state had paid, $3,090.69 (ECF 32 at *42). However, neither Petitioner's motion nor the New York letter provided instructions for payment of the lien.[3] Thus, on August 19 and August 23, 2024, Petitioner was asked to provide this information. Informal Communication, dated Aug. 20, 2024; Scheduling Order (NON PDF), issued Aug. 23, 2024.

On September 17, 2024, Petitioner filed Exhibit 12, an updated Medicaid lien requesting reimbursement of an increased amount of $5,599.77 (ECF No. 36). Petitioner did not acknowledge the discrepancy or state whether Respondent agreed to reimbursement of the additional sums. On September 18, 2024, I directed Petitioner to file a joint status report confirming that the parties had conferred about the updated lien and stating whether they were in agreement about its reimbursement (ECF No. 37).

On September 19, 2024, Petitioner filed Exhibits 13 and 14, containing additional medical records,[4] and a joint status report (ECF Nos. 38, 39). In the joint status report, Petitioner states that "Respondent objects to reimbursement of any of the 2023 entries in the Medicaid lien." Petitioner's Joint Status Report at *1 (ECF No. 39). However, Petitioner's position is that "the entire Medicaid lien should be reimbursed as they are all compensable claims related to her left shoulder injury." *Id.* Petitioner did not state how

---

[3] Petitioner's motion should have clearly stated the amount of the Medicaid lien and provided complete payment instructions. Further, when Petitioner obtained the updated lien, Petitioner should have noted the discrepancy in the amount of the lien and consulted with Respondent to determine Respondent's position. Upon learning that the parties' positions differed on reimbursability of the full lien amount, Petitioner should have provided the court with the amount that would be reimbursable based on each party's position. Petitioner's counsel's failure to comprehensively address these details has delayed issuance of this Decision and resulted in judicial inefficiency.

[4] Petitioner did not explain what these records are or propose any action on them. The records appear to be for physical therapy in 2023 and 2024. Because I have determined herein that Petitioner's return to treatment in 2023 is not related to her SIRVA, these records are not relevant to this Decision.

much of the lien would be reimbursable if I were to accept Respondent's argument.[5] The matters of whether Petitioner is entitled to compensation and, if so, how much, are now ripe for consideration.

## II.   Factual Evidence

Although I have reviewed the entire record, this decision summarizes only evidence relevant to the onset of Petitioner's shoulder pain, Petitioner's entitlement to damages, and the amount of damages.

### A.   Medical Records

Petitioner received the flu vaccine in her left deltoid on September 28, 2020. Ex. 7 at 4. The vaccine was given during an appointment with Dr. James Loehr of Cayuga Family Medicine.[6] Ex. 1 at 133.

On November 11, 2020, Petitioner had a telemedicine visit with Dr. Sarah Wineholt of Cayuga Family Medicine for a refill of medication for depression and anxiety. Ex. 1 at 105. She also discussed gastrointestinal issues which had started months earlier due to a virus but she now attributed to one of her medications. *Id.* She did not mention any problems with her left shoulder. *Id.* at 105-06.

A month later (December 11, 2020) – and now over two months post-vaccination - Petitioner had another telemedicine visit with Dr. Wineholt. Ex. 1 at 110. She complained of left arm and shoulder pain that had been present for over two months, and gotten worse in the past four weeks. *Id.* The pain was constant, and she felt a sharp and shooting pain with certain movements. *Id.* She noted significant limitations in her range of motion ("ROM"), especially if she tried to reach behind her back or scratch her head. *Id.* Her shoulder became sore if she carried weight with her left arm. *Id.* Pain extended down to her elbow, but not to her hand. *Id.* She initially thought the pain was due to poor ergonomics of her home workstation, but she had made improvements to the workstation with minimal improvement in her shoulder pain. *Id.* She had tried a TENS[7] unit with some success, but obtained no relief from heat or ice. *Id.* She was unable to take non-steroidal anti-inflammatory medications due to kidney disease, and Tylenol did not help. *Id.* She was not aware of any specific injuries or incidents that caused her shoulder pain. *Id.* On video examination no gross deformity was seen, though Petitioner demonstrated limited

---

[5] The updated Medicaid lien includes an entry dated August 19, 2021. Ex. 12 at 4. The parties' briefing does not address any treatment on this date, and it is unclear whether this date of service was included in the original Medicaid lien amount.

[6] Petitioner also received a Pneumovax vaccine in her right deltoid on the same date. Ex. 8 at 4.

[7] TENS is an abbreviation for transcutaneous electrical nerve stimulation, which involves electrical stimulation of nerves that interferes with transmission of pain signals. *TENS* and *transcutaneous electrical nerve stimulation*, DORLAND'S ONLINE, https://www.dorlandsonline.com/dorland/definition?id=108464 (last visited Aug. 12, 2024).

ROM with internal and external rotation but "decent' motion with abduction, adduction, and forward flexion. *Id.* at 111. Dr. Wineholt assessed her with left shoulder pain of unclear etiology, and prescribed a trial of steroids to help with inflammation and pain, as well as physical therapy ("PT"). *Id.*

The next month (January 7, 2021), Petitioner underwent a PT evaluation for her left shoulder at Cayuga Medical Center.[8] Ex. 10 at 886. She reported left shoulder and bicep pain after a September 28, 2020 vaccination. *Id.* Initially, left shoulder was sore "like a normal vaccine," but then continued to worsen. *Id.* She was dealing with another medical problem, nausea and vomiting after a virus in June 2020, at the time, and thus did not seek care for her left shoulder right away. *Id.* She stated that her left shoulder joint felt "very sore," with burning and occasional stabbing pain. *Id.* Her bicep and deltoid muscles were sore and tender to touch. *Id.* Her pain was worsened by carrying things in her left hand, reaching behind her back, sudden movements, lying on her left shoulder, poor posture when working at her computer, and reaching overhead. *Id.* Once her shoulder was aggravated, it remained flared up all day. *Id.* A TENS device had helped, while ice and Tylenol had not. *Id.* Prednisone did not resolve her symptoms. *Id.*

Petitioner's pain at the time of the evaluation was five out of ten, and ranged from two at best to seven at worst. Ex. 10 at 886. On examination, her left shoulder active ROM was 78 degrees in flexion and 81 degrees in abduction.[9] *Id.* at 887. Her left shoulder passive ROM was ten degrees in internal and external rotation.[10] *Id.* Her entire anterior deltoid and bicep were tender to touch. *Id.* She was assessed with pain and limited ROM likely secondary to a reaction to the flu vaccine. *Id.* A treatment plan of two sessions a week for eight weeks was established, and Petitioner continued PT for several months. *Id.* at 888.

At her fifth PT visit (January 22, 2021), Petitioner reported improvements in ROM but increased soreness for the past two days. Ex. 10 at 876. The next week (January 29, 2021), she felt her shoulder was about 50% better, but she remained limited with many activities, especially with external rotation. *Id.* at 872.

On February 3, 2021, Petitioner's left shoulder active ROM had improved to 100 degrees in flexion (compared to 78 degrees at the start of treatment), while her passive

---

[8] Petitioner's motion (ECF No. 32 at 5) asserts that she was also seen by her physician at Cayuga Medical Center on January 7, 2021, but the record Petitioner cites (Ex. 3 at 46) is a duplicate record of her January 7th PT evaluation. It does not appear that Petitioner was seen for a separate medical consultation on this date.

[9] Normal shoulder flexion for adults ranges from 165 to 180 and normal abduction for adults varies from about 170-180 degrees. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80 (F. A. Davis Co., 5th ed. 2016).

[10] Normal shoulder ROM for adults ranges from 90 to 100 degrees in external rotation, and 70 to 90 degrees in internal rotation. Norkin and White, MEASUREMENT OF JOINT MOTION 84, 88 (2016).

ROM was now 68 degrees in internal rotation (compared to ten degrees initially); her active abduction and passive external rotation remained unchanged from the start of treatment. Ex. 10 at 890. She reported that overall her left shoulder felt 40-50% better since starting PT. *Id.* at 889. The therapist noted "marked improvement since starting PT," and that Petitioner had full passive ROM in flexion and abduction but continued to have limitations in active ROM due to pain with contraction. *Id.* at 890.

By February 26, 2021, Petitioner's shoulder was "feeling okay." Ex. 10 at 864. About one day a week her shoulder pain hurt a lot when she went to bed, and continually woke her up. *Id.* Then, by March 5, 2021, Petitioner reported that her shoulder was "about 50% better since starting PT," and she was able to do a lot more.[11] Ex. 10 at 862. She continued to be unable to scratch her back or "grab her seatbelt," and was significantly limited in her ability to reach overhead. *Id.* On March 12, 2021, Petitioner reported that she had lifted a heavy chair two days prior "for a few feet." *Id.* at 860. Her external rotation was still limited, but she was making progress. *Id.* On March 26, 2021, Petitioner showed improvements in flexion and extension, but her internal and external rotation remained "extremely limited." *Id.* at 856. She had pain and instability with lowering her arm. *Id.* at 857.

Petitioner saw orthopedist Dr. Ashley Anderson of Cayuga Orthopedics for left shoulder pain on March 31, 2021.[12] Ex. 5 at 4. Petitioner reported progressively worsening left shoulder pain and stiffness since September after receiving a flu shot in her left arm. *Id.* She had difficulty with reaching and overhead movements. *Id.* Prednisone had not helped, while PT had been of limited benefit. *Id.* On examination, her left shoulder active ROM was 30 degrees in forward flexion, 40 degrees in abduction, and 30 degrees in external rotation. *Id.* at 5. Her left shoulder passive ROM was 120 degrees in forward flexion and 100 degrees in abduction. *Id.* She had positive Neer and Hawkins impingement signs. *Id.* Dr. Anderson found that Petitioner had shoulder bursitis with components of adhesive capsulitis following a flu shot, and administered a steroid injection. *Id.* Dr. Anderson also ordered an MRI and recommended that Petitioner continue PT. *Id.*

Petitioner underwent a left shoulder MRI on April 9, 2021. Ex. 5 at 11. The clinical indication for the test was "[p]ain [after] flu vaccine 9/28/20." *Id.* The MRI showed partial tears of the supraspinatus and infraspinatus tendons, a small glenohumeral joint effusion,

---

[11] Petitioner also states she attended PT on March 10, 2021; however, the record she cites (Ex. 3 at 9) is a March 5th PT visit, and there is no documentation of a March 10th PT visit.

[12] Petitioner asserts that she was also seen at Cayuga Orthopedics on March 3, 2021 in addition to March 31st. Petitioner's Motion (ECF No. 32) at *6, 8. However, the record Petitioner cites for a March 3rd visit is the same record she cites for the March 31st visit (Ex. 4 at 3). It does not appear that Petitioner was seen at Cayuga Orthopedics on March 3rd.

thickening of the glenohumeral ligament with mild adjacent edema, minimal fluid within the subdeltoid/subacromial bursa, and arthropathy. *Id.* at 12.

Petitioner saw Dr. Anderson to review the MRI on April 21, 2021. Ex. 5 at 7. She reported improvement in comfort and ROM since the steroid injection three weeks prior, and was making progress in PT. *Id.* On examination, Petitioner's left shoulder ROM was 130 degrees in forward flexion and 80 degrees in external rotation. *Id.* at 8. Dr. Anderson read the MRI as showing small partial tears of the supraspinatus and infraspinatus, tendinosis, bursitis, mild arthritis, and capsular thickening consistent with adhesive capsulitis. *Id.* Dr. Anderson assessed Petitioner with an incomplete rotator cuff tear as well as bursitis and adhesive capsulitis of the left shoulder, and recommended continued conservative care. *Id.*

On April 26, 2021, Petitioner told her physical therapist that her left arm was "a little sore" because she had gardened twice in the past week. Ex. 10 at 848. Her active ROM was still limited, but the pain was now "tolerable." *Id.* at 849.

At her 22nd PT visit the next month (May 17, 2021), Petitioner noted improvements in her internal rotation and flexion in the past week. Ex. 10 at 841. External rotation movements were improved but still painful. *Id.* at 841.

Petitioner returned to Dr. Anderson on May 27, 2021, reporting continued improvement in her ROM with PT. Ex. 5 at 9. On examination, her left shoulder active ROM was 150 degrees in forward flexion and her passive ROM was 170 degrees in forward flexion, 170 degrees in abduction, and 80 degrees in external rotation. *Id.* at 10. She continued to have positive Hawkins impingement signs. *Id.* Dr. Anderson recommended that she continue PT and conservative management. *Id.*

By June 11, 2021, Petitioner reported in PT that she was able to put on her seatbelt and had seen improvements with overhead activities, but her internal rotation was still limited. Ex. 10 at 838. Her overall pain level was much better, with pain mostly at end ranges of motion. *Id.* at 839. At her next PT session (June 15, 2021), Petitioner told her physical therapist that she was able to ride her bike the prior weekend without any pain. *Id.* at 836. By her next PT visit (June 24, 2021), she had markedly improved internal rotation and felt much stronger. *Id.* at 834.

Petitioner attended a total of 26 PT sessions between January and July 2021. Ex. 10 at 832-886. At discharge on July 5, 2021, her left shoulder was "now nearly fully functional," with her biggest complaint being that she "can't scratch back with same ROM as R UE [upper extremity], but it is improving."[13] *Id.* at 832. She was continuing to make

---

[13] Petitioner's PT discharge record documents the same pain ratings as her initial evaluation six months prior, ranging from two at best to seven at worst, and a current pain rating of five out of ten. Ex. 10 at 832. This does not appear fully consistent with the remainder of the records, which reflect improvements in her pain levels and that her shoulder was nearly fully functional.

improvements in her shoulder ROM, function, and pain levels, with remaining limitations in external and internal rotation. *Id.* Thereafter, there are no records of treatment for Petitioner's left shoulder for over a year and a half.

Petitioner underwent a PT evaluation for left sided neck/shoulder pain on February 20, 2023. Ex. 10 at 188. She reported that this pain had started in the fall of 2022. *Id.* She had a previous left shoulder injury from a vaccination, but with PT had "restored 90% of her functional strength and range of motion. Pt [patient] reports that this pain is different," with pain when she looked to her left, particularly with driving and carrying her purse on the left side. *Id.* She thought the pain could be related to her posture, her work at home environment, or her new job position. *Id.* Her pain was zero out of ten at best and six out of ten at worst. *Id.* Petitioner had decreased ROM, impaired motor control, impaired proprioception, and tenderness to palpation. *Id.* at 190. The therapist assessed her as having signs and symptoms consistent with subacute neck pain with mobility deficits referring pain to her shoulder – in other words, pain stemming from her neck that she also felt in her shoulder. *Id.* Petitioner attended seven PT sessions between February 20 and April 21, 2023. Ex. 10 at 179-188; Ex. 11 at 16-23.

### B. Affidavit

Petitioner filed an affidavit in support of her claim. Ex. 2. On the day she received the vaccine, her left arm hurt more than her right arm. *Id.* at ¶ 10. However, her pre-existing nausea "was so bad that it was almost a relief to have something distracting [her] from it." *Id.* The pain worsened over the course of that week until she could not lift her arm without severe pain, but she did not dwell on the pain because she was preoccupied with her nausea, working full time, and homeschooling her special needs child due to the COVID-19 Pandemic. *Id.* at ¶¶ 7, 10. She had "extremely limited motion," with difficulty putting her arm behind her back. *Id.* at ¶ 7. By November 2020, she figured out that a medication was causing her nausea, and swiftly experienced a full recovery when she stopped the medication. *Id.* at ¶ 11. She explains that "[i]t was the relief that came with my nausea being resolved that finally let me focus on my left shoulder, which by now had become severely compromised." *Id.*

She requested a doctor's appointment for her shoulder pain on November 22, 2020, and the appointment occurred on December 11th. Ex. 2 at ¶¶ 12-13. Her doctor prescribed prednisone, which resulted in only a slight reduction in her upper arm swelling. *Id.* at ¶ 13. At the time, it had not occurred to her that her shoulder pain was related to her vaccination. *Id.* at ¶ 12. After talking to her doctor and looking at her calendar and her conversations with her family about how she had been feeling in the weeks after vaccination, she realized that her pain had begun at the same time as the flu vaccination. *Id.*

She then attended PT. Ex. 2 at ¶ 14. While she saw improvements in mobility and functionality, her pain persisted and her ROM remained poor, especially in reaching

behind her back. *Id.* at ¶ 15. The cortisone injection she received in March 2021 from Dr. Anderson reduced her swelling and pain for a few weeks. *Id.* at ¶ 16.

For at least six months after receiving the flu vaccine, Petitioner could not lift her left arm above a 90 degree angle without excruciating pain, could not pull a blanket over her at night, and could not sleep on her stomach as she did previously. Ex. 2 at ¶ 18. She could not lift a ladder or items weighing ten to twenty pounds at work, and her ability to lift her arms to take a steady photo has been compromised. *Id.* Household tasks such as changing a bed, doing laundry, and landscape maintenance have become excruciating or impossible. *Id.*

Petitioner works at a desk during the day and has to take breaks to rest her arm. Ex. 2 at ¶ 19. Her job involves inspecting homes, including climbing ladders to check attics. *Id.* Because she cannot carry a ladder, she has had problems being able to complete her inspections. *Id.* She has had to decline well-paying jobs in landscape design and maintenance because they required physical labor she cannot perform because of her injury. *Id.* She cannot use a full-size vacuum without help or pain, and is unable to clean her home properly. *Id.* at ¶ 20. She continues to have difficulty with driving, self care, grocery shopping, and holding her cat. *Id.* Her injury has made her unable to engage in hobbies such as gardening and biking, and impaired her ability to care for her child. *Id.* at ¶ 21.

As of October 2021 (when she signed her affidavit), she was "still suffering pain and range of motion issues." Ex. 2 at ¶ 17. She described constant pain and occasional stabbing pain, with stiffness, soreness, and weakness. *Id.* at ¶ 7. She was told that if she did not progress beyond a certain point she would need surgery. *Id.*

### III.    Factual Findings and Ruling on Entitlement

#### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper

treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[14]  a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . .  does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion

---

[14] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii) Pain occurs within the specified time-frame;

> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B.  Parties' Arguments on Onset and Entitlement

Petitioner argues that her shoulder pain began within 48 hours of vaccination, notwithstanding the fact that she did not seek care for her shoulder until nearly two and a half months later. Petitioner's Motion for Ruling on the Record and Brief in Support of Damages, filed July 15, 2023, at *17-20 (ECF No. 32) ("Mot."). Petitioner explains that she waited to seek care not because her pain was mild or insignificant, but because she was dealing with debilitating nausea and was struggling to balance work and homeschooling her child due to the Pandemic. Mot. at *18. By the time she finally discovered the cause of her nausea, her shoulder pain was debilitating and impacting her daily functioning. *Id.* She then sought care, and those medical records support a finding that her shoulder pain began within 48 hours. *Id.* at *19.

Respondent argues that Petitioner has not established a Table SIRVA because she has not demonstrated by preponderant evidence that her shoulder pain began within 48 hours of vaccination. Respondent's Rule 4(c) Report and Response to Petitioner's Motion, filed Sept. 14, 2023, at *9-11 (ECF No. 33) ("Resp."). Respondent emphasizes that Petitioner did not report shoulder pain until December 11, 2020, 74 days after vaccination – including during an intervening appointment with her primary care physician ("PCP"). Resp. at *9. In that context, Respondent argues that Petitioner's 2021 declaration "does not outweigh the contemporaneous medical record." *Id.*

Respondent acknowledges Petitioner's contention that she delayed seeking treatment due to overriding gastrointestinal symptoms and personal and work obligations, but points out that even when she did seek care, she did not attribute her pain to her flu vaccination. Resp. at *10. And in Respondent's view, Petitioner "overstates that her treating physicians have consistently linked her flu vaccination to her shoulder injury," noting that Petitioner's recounting of facts erroneously states she saw her PCP on January 7 and February 3, 2021 and her orthopedist on March 3, 2021. *Id.* Beyond those errors, Respondent argues that notations by Petitioner's providers primarily reference a temporal relationship – reported by Petitioner herself – between vaccination and the onset of Petitioner's pain. *Id.* Finally, Respondent asserts that the statements in the orthopedic and PT records supporting a causal link are "only as good as the reasons and evidence that support them," and those providers did not explain their statements." *Id.* at *10-11

(*citing Davis v. Sec'y of Health & Human Servs.*, 20 Cl. Ct. 168, 173 (1990)). Respondent does not contest the remaining SIRVA QAI requirements or statutory requirements.

Petitioner replies that it was not lack of pain, but other health issues, that led her to wait to seek treatment. Petitioner's Reply, filed Sept. 29, 2023 at *3-4 (ECF No. 34) ("Reply"). Petitioner argues that an intervening doctor's visit does not negate a finding of onset within 48 hours, citing *Boyd v. Sec'y of Health & Human Servs.*, No. 19-1107V, 2021 WL 4165160 (Fed. Cl. Spec. Mstr. Aug. 12, 2021) (finding onset within 48 hours despite two intervening doctor visits between vaccination and reporting shoulder pain). Reply at *4. Petitioner emphasizes that her affidavit and medical records support a finding that her pain began on the day of vaccination. *Id.* at 3-5.

### C. Factual Findings on Onset

I find that preponderant evidence supports a finding that Petitioner's left shoulder pain began within 48 hours of vaccine administration. I acknowledge that she did not seek care for shoulder pain until two and a half months after vaccination, and saw her PCP once in the interim for other matters. However, Petitioner has credibly explained the reason for this omission – that she was dealing with a more disruptive health concern, severe nausea, which eclipsed her shoulder pain, in addition to working full time and homeschooling a child.

Once Petitioner's nausea resolved, she sought care for her shoulder pain. Although she did not relate her pain to her flu vaccination at the first appointment for shoulder pain, she did state that the pain had been present for over two months, putting the onset close in time to vaccination. And thereafter, she consistently related her shoulder pain to her flu vaccination.

I have stated in numerous cases that it is not uncommon for SIRVA petitioners to delay seeking care for weeks or months in hopes that their pain will resolve without the need for formal treatment. *Amor v. Sec'y of Health & Human Servs.*, 20-0978, 2024 WL 1071877, at *6 (Fed. Cl. Spec. Mstr. Feb. 8, 2024); *Winkle v. Sec'y of Health & Human Servs.*, No. 20-0485V, 2021 WL 2808993, at *4 (Fed. Cl. Spec. Mstr. June 3, 2021). Although evidence of intervening appointments that do not mention shoulder pain are relevant, they are not dispositive of the onset question. *See Boyd*, 2021 WL 4165160, at *6 (finding onset within 48 hours despite two intervening primary care encounters without referencing shoulder pain).

Overall, the record preponderantly supports a finding that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccination. Petitioner sought care two and a half months after vaccination, reporting shoulder pain for over two months. Ex. 1 at 110. At her PT evaluation, she described pain resulting from her September flu vaccination. Ex. 10 at 886. She told her orthopedist her shoulder pain had been present since September after receiving a flu shot. Ex. 5 at 4. Her MRI was done due to pain after her September 28th flu vaccination. *Id.* at 11. And Petitioner's affidavit testimony credibly

explains the reason for her treatment delay, and why she did not report her shoulder pain at the intervening November 2020 appointment. Ex. 2 at ¶ 10. Her delay in seeking care is relevant, however, to damages.

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

Respondent does not contest any of the remaining SIRVA QAI criteria, and I find that the record contains preponderant evidence that they are satisfied. Petitioner did not have a history of left arm pain or injury prior to vaccination that would explain her symptoms after vaccination. Exs. 1, 3. Her pain and reduced ROM were limited to her left shoulder, where the flu vaccine was administered, and no other condition or abnormality has been identified that would explain her post-vaccination symptoms. *Id.*

Respondent does not contest the statutory requirements for compensation, and I determine that the record contains preponderant evidence that other requirements for entitlement are satisfied as well. Petitioner received a covered vaccine in the United States. Ex. 7 at 4. She states that neither she, nor any other party, has ever received an award or settlement for her vaccine-related injury or filed a civil action. Ex. 2 at ¶ 8.

### E. Entitlement

I find that Petitioner has established by a preponderance of the evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## IV.   Damages

### A. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V,

1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior pain and suffering awards to aid in determining the appropriate amount of compensation for pain and suffering in a case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[15] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

### B.  Prior SIRVA Compensation Within SPU[16]

---

[15] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[16] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

## 1.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2024, 4,138 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,016), with the remaining 122 cases dismissed.

2,308 of the compensated SPU SIRVA cases were the result of a reasoned ruling that the petitioner was entitled to compensation (as opposed to an informal settlement or concession).[17] In only 235 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[18] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[19]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[20] Agreement |
|---|---|---|---|---|
| **Total Cases** | *235* | *2,044* | *29* | *1,708* |
| **Lowest** | $35,000.00 | $10,000.00 | $45,000.00 | $2,500.00 |

---

[17] The remaining 1,708 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[18] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,044 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[19] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[20] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

| 1st Quartile | $67,910.00 | $60,539.19 | $90,000.00 | $35,000.00 |
|---|---|---|---|---|
| **Median** | **$85,920.03** | **$80,240.98** | **$130,000.00** | **$50,000.00** |
| 3rd Quartile | $125,066.35 | $109,681.54 | $162,500.00 | $77,500.00 |
| Largest | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### 2.    Pain and Suffering Awards in Reasoned Decisions

In the 235 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $35,000.00 to $215,000.00, with $85,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[21] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[22]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed

---

[21] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[22] *Joyce v. Sec'y of Health & Human Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In eight cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### C.  Parties' Arguments

Petitioner proposes a pain and suffering award of $70,000.00. Mot. at *38. Petitioner cites *Bergstrom*, *Belka*, *Heiner*, and *Celuch* in support, all of which featured pain and suffering awards ranging from $60,000.00 to $80,000.00.[23] *Id.* at *34-37. Petitioner asserts that her injury and treatment are most comparable to *Bergstrom* and *Celuch*. Mot. at *37. Like the petitioners in those cases, Ms. Tully had a short delay in seeking treatment, then underwent conservative care including PT and cortisone injections, with the *Bergstrom* petitioner receiving two cortisone injections and the *Celuch* petitioner receiving one cortisone injection – like Ms. Tully. *Id.*

Respondent proposes a modest pain and suffering award of "less than $55,000.00." Resp. at *12. Respondent cites *Norton*, *Rayborn*, and *Clendaniel*, with pain and suffering awards of $55,000.00, $55,000.00, and $60,000.00, respectively, in support of his proposed award.[24] *Id.* at *14-15.

Respondent characterizes Petitioner's injury as mild despite her reports of significant pain levels, with marked improvement each month from conservative treatment (primarily PT). Resp. at *12. Petitioner's treatment concluded approximately nine months after vaccination and included 26 PT sessions, a course of prednisone, and a cortisone injection. *Id.* at *13. Respondent argues that Petitioner's recovery was quick and steady, noting that only three weeks after starting PT, she described her shoulder as "about 50% better," and that by the seventh week of PT she was only experiencing sleep disruption from her shoulder once a week. *Id.* at *13. After her steroid injection, she was able to resume gardening, bicycling, and no longer had issues using her seatbelt. *Id.*

Respondent disputes Petitioner's contention that her SIRVA-related sequela continued for three years, arguing that her 2023 PT sessions were for pain that started in

---

[23] *Bergstrom v. Sec'y of Health & Human Servs.*, No. 19-0784V, 2021 WL 5754968 (Fed. Cl. Spec. Mstr. Nov. 2, 2021); *Belka v. Sec'y of Health & Human Servs.*, No. 20-0585V, 2022 WL 4717891 (Fed. Cl. Spec. Mstr. Sept. 1, 2022); *Heiner v. Sec'y of Health & Human Servs.*, No. 19-1339V, 2022 WL 4457901 (Fed. Cl. Spec. Mstr. Aug. 29, 2022); and *Celuch v. Sec'y of Health & Human Servs.*, No. 18-544V, 2021 WL 2368137 (Fed. Cl. Spec. Mstr. May 10, 2021).

[24] *Norton v. Sec'y of Health & Human Servs.*, No. 19-1432V, 2021 WL 4805231 (Fed. Cl. Spec. Mstr. Sept. 14, 2021); *Rayborn v. Sec'y of Health & Human Servs.*, No. 18-226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020); *Clendaniel v. Sec'y of Health & Human Servs.*, No. 20-213V, 2021 WL 4258775 (Fed. Cl. Spec. Mstr. Aug. 18, 2021).

the fall of 2022, which Petitioner specifically described as being different from her SIRVA pain. Resp. at *13-14. Respondent distinguishes the cases Petitioner cites, arguing that the *Heiner* petitioner reported more severe pain – as high as ten out of ten – than Ms. Tully. *Id.* at *15. And the *Belka* petitioner received one more cortisone injection, and was only 85% improved at 12 months after vaccination – contrasted with Ms. Tully, who was almost fully recovered nine months after vaccination. *Id.* at *16.

Petitioner replies that her shoulder was 90% recovered when she stopped treatment nine months after vaccination in July 2021, but she was left with residual shoulder pain. Reply at *6. Her residual shoulder pain began to worsen in the fall of 2022, and became severe enough that she sought more PT in February 2023. *Id.* Although the record describes her pain as feeling different than her prior shoulder pain, Petitioner argues that she did not report that the pain stemmed from a different injury. *Id.* at *7. She asserts that the "use of the previous history to explain what helped Petitioner feel relief 'last time' she was treated for this injury is indicative of Petitioner's treatment being a continuation of her SIRVA treatment." *Id.*

Although Petitioner told the therapist in 2023 that she thought her pain could be from posture, her work from home environment, or her new job, Petitioner now states that she "is not claiming that any of these factors are the *cause* of her injury, only that these are factors that may be related to why her SIRVA pain had been worsening." Reply at *8 (emphasis in original). Petitioner emphasizes that "there is no evidence of any trauma, injury, or accident that could have caused a new left shoulder injury" to Petitioner's left shoulder. *Id.* From this, Petitioner concludes that "[t]he only explanation for her worsening left shoulder pain is an increase in her residual SIRVA pain, possibly exacerbated by her working from home, her posture, or her new position at her job." *Id.* As such, Petitioner argues that the 2023 PT visits should be considered continued treatment for her SIRVA. *Id.*

Petitioner argues that the cases Respondent cites involve petitioners who recovered in seven to fourteen months and underwent less extensive treatment. Reply at *10. Although the *Norton* petitioner also alleged a SIRVA-related return to PT after a break in treatment, that petitioner's return to PT was found to be for an unrelated aggravation of a prior rotator cuff tear – which Ms. Tully distinguishes by asserting that she had no other incidents or injuries that explain her residual and worsening pain that resulted in her return to PT. *Id.* Petitioner argues that her affidavit testimony and medical records demonstrate that she has suffered since the onset of her shoulder injury on September 28, 2020, and treated with two rounds of PT totaling 33 sessions, a cortisone injection, an MRI, and visits to her primary care physician and an orthopedist. Reply at *12-16. In Petitioner's view, this justifies an award in line with Petitioner's cited cases. *Id.* at *17.

Concerning the Medicaid lien, Respondent's view is that the evidence does not preponderantly show that Petitioner's SIRVA-related sequela endured until 2023. Petitioner's Joint Status Report, filed Sept. 19, 2024, at *1 (ECF No. 39) ("JSR"). Respondent notes that Petitioner reported to her physical therapist in 2023 that her neck and shoulder pain started in the fall of 2022 and "explicitly declaimed any connection to her SIRVA and explained that the current pain was different," providing other possible sources of her pain. JSR at *1-2.

Petitioner argues that her 2023 shoulder pain "may have related different triggers . . . the fact remains that she would not have had such triggers but for her SIRVA injury." JSR at *2. Petitioner adds that there is no record evidence that Petitioner made a full recovery from her SIRVA and suffered a new injury in 2023. *Id.* Thus, the parties "request the Court make a ruling on the amount to be reimbursed to the appropriate Medicaid agency." *Id.*

## D. Appropriate Compensation for Pain and Suffering

In this case, Petitioner's awareness of her injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

Petitioner has *not* demonstrated by preponderant evidence that her return to PT in 2023 was to treat SIRVA-related sequela. The only suggestion that this treatment was related to her SIRVA is attorney argument. The PT records, on the other hand, preponderate *against* a finding that the 2023 treatment was related to her SIRVA, with Petitioner specifically describing the pain as "different" and stating that it began in *2022*. Furthermore, the 2023 PT treatment was for *neck* and shoulder pain, which the therapist assessed as being *neck* pain that was referring pain to her shoulder. Ex. 10 at 290. Although Petitioner reported that PT had restored 90% of her functional strength and ROM, Petitioner provided this information in the context of explaining that this pain was different – which suggests that her 2023 pain was *not* related to her SIRVA.

Otherwise, the record establishes that Petitioner suffered a moderate SIRVA, which was 50% improved within four months, and her shoulder was "nearly fully functional" by a little over nine months after vaccination. Ex. 10 at 832, 872. Initially, she had moderate to severe limitations in her ROM, and moderate pain levels. She obtained minimal improvement from a cortisone injection. With PT, however, she regained ROM and function quickly, describing her shoulder as 50% better three weeks after starting PT. Ex. 10 at 872. Through her course of PT there were ups and downs, but she had consistent gains in ROM and function. Less than nine months after vaccination (June 15, 2021), she was able to ride her bike without pain. *Id.* at 836. And when she was discharged from PT a few weeks later, her biggest complaint was her inability to scratch her back with her left arm as well as with her right arm. *Id.* at 832.

Of the cases cited, the best comparables are *Rayborn*, *Celuch*, and *Heiner*, which involved injuries of similar duration and severity. Petitioner's other cases (*Bergstrom* and *Belka*) are not good comparisons, involving petitioners whose injuries continued for several months longer, among other differences.[25]

In *Rayborn*, the petitioner first sought care for her shoulder injury approximately four months after vaccination. *Rayborn*, 2002 WL 5522948 at *2. On examination, the petitioner's active ROM in abduction was 85 degrees – similar to that of Ms. Tully. *Id.* A cortisone injection provided good pain relief for approximately two weeks – similar to Petitioner. *Id.* at *3. The *Rayborn* petitioner attended 14 occupational therapy sessions, less than Petitioner. *Id.* At discharge from therapy, the *Rayborn* petitioner's pain level was one to two with activity, and she had excellent ROM in all planes – though she continued to have deficits in activities of daily living, coordination, endurance, pain, proprioception, ROM, and strength. *Id.* I awarded the *Rayborn* petitioner $55,000.00 in pain and suffering.

In *Celuch*, the petitioner sought care 63 days after vaccination, somewhat sooner than Ms. Tully, and both petitioners had similar pain ratings. *Celuch*, 2021 WL 2368137, at *4. The *Celuch* petitioner received one cortisone injection and attended 24 PT sessions – similar to Ms. Tully – and was awarded $70,000.00 in pain and suffering. *Id.*

Ms. Tully, like the *Rayborn* and *Celuch* petitioners, received one cortisone injection and treated conservatively with PT, with Ms. Tully and the *Celuch* petitioner attending similar amounts of PT. The *Celuch* petitioner sought care somewhat sooner than Ms. Tully, while the *Rayborn* petitioner took one month longer to seek treatment.

*Heiner* is a non-SPU case, and thus I place somewhat less emphasis on it. Nevertheless, it has similarities to Ms. Tully's case. The *Heiner* petitioner did not seek care until approximately five months after vaccination, but reported somewhat higher pain levels than Ms. Tully (three to ten out of ten in *Heiner*, compared to two to seven for Ms. Tully). *Heiner*, 2022 WL 4457901 at *4. Both petitioners had significant reductions in ROM, and treated with one steroid injection and PT, though the *Heiner* petitioner attended only four PT sessions. *Id.* at *4-5. The special master in *Heiner* awarded $60,000.00 in pain and suffering, noting that petitioner's injury interfered with her ability to perform work activities and participate in marathons and triathlons. *Id.* at *13.

I find that this case falls somewhat between *Rayborn* and *Celuch*. Compared to *Heiner*, it has similarities and differences that warrant a similar award.

### E.  Medicaid Lien

The evidence preponderantly demonstrates that Petitioner's SIRVA continued until her discharge from PT on July 5, 2021. At that point, her left shoulder was nearly fully

---

[25] The petitioners in *Bergstrom* and *Belka* both had two cortisone injections, and the *Bergstrom* petitioner had higher pain levels while the *Belka* petitioner attended more PT.

functional and her biggest complaint was an inability to scratch her back with the same ROM as her right shoulder. Ex. 10 at 832.

I do not find Petitioner's 2023 PT to be related to her SIRVA. As such, the portions of the Medicaid lien related to this treatment are not compensable, and I award compensation for the Medicaid lien amount included with Petitioner's motion, $3,090.69. Ex. A attached to Mot.


## Conclusion


For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner's left shoulder injury meets the definition for a Table SIRVA, and that Petitioner is entitled to compensation in this case. Furthermore, I find that $62,500.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering. The parties are in agreement that if Petitioner is found entitled to compensation, the portions of the Medicaid lien relating to treatment in 2020 and 2021 should also be reimbursed. Mot. at *38; Resp. at *2 n.1; JSR at *1-2. However, the portions of the Medicaid lien for later treatment are not reimbursable.**

**Therefore, I award Petitioner the following:**

- **$62,500.00 for pain and suffering[26] in the form of a check payable to Petitioner; and**

- **A lump sum payment of $3,090.69, representing compensation for satisfaction of a Medicaid lien, in the form of a check payable jointly to Petitioner and:**

  **New York State Department of Health**
  **P.O. Box 415872**
  **Boston, MA 02241-5874**
  **Recovery Case: 171782**

---

[26] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

**Petitioner agrees to endorse the check to the New York State Department of Health for satisfaction of the Medicaid lien.**

These amounts represent compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[27]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[27] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.